# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ENDOWMENT RESEARCH GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0627-KSJM |
| | ) | |
| WILDCAT VENTURE PARTNERS, LLC, and BILL ERICSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 18, 2020
Date Decided: March 5, 2021

John M. Seaman, E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, DE; William C. Price, Michael T. Zeller, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, CA; *Counsel for Plaintiff Endowment Research Group LLC*.

Gregory P. Williams, Robert L. Burns, Megan E. O'Connor, RICHARDS, LAYTON & FINGER, P.A, Wilmington, DE; Kathleen H. Goodhart, COOLEY LLP, San Francisco, CA; *Counsel for Defendants Wildcat Venture Partners, LLC, and Bill Ericson*.

**McCORMICK, V.C.**

Plaintiff Endowment Research Group ("ERG") is an investment consulting firm that connects investor clients with fund managers. In mid-2018, Defendants Wildcat Venture Partners, LLC ("Wildcat") and its founding partner Bill Ericson asked ERG for help finding investors for Wildcat's funds and promised to pay ERG a portion of the fees earned. ERG agreed, and Wildcat signed a non-disclosure agreement (the "NDA") protecting ERG's confidential client information. ERG then introduced Wildcat to ERG's clients. In July 2019, Ericson revealed that Wildcat never intended to pay for ERG's services or abide by the NDA. ERG brought this action against Wildcat to enforce the NDA and the oral agreement to compensate ERG. ERG claims that Wildcat has breached and repudiated the agreements or, in the alterative, never intended to adhere to them. ERG also asserts claims of unjust enrichment and quantum meruit. The defendants have moved to dismiss the complaint. They argue that the court lacks subject matter jurisdiction and that ERG fails to state a claim. Ericson has also moved to dismiss for lack of personal jurisdiction. This decision grants the motion as to Ericson but largely denies the motion as to Wildcat.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Supplemented Complaint (the "Supplemented Complaint") and its exhibit.[1]

### A. Wildcat Engages ERG.

ERG is an investment consulting firm that specializes in developing relationships with successful fund managers to advise its investor clients how to invest their assets. ERG describes its relationship with its clients as "invaluable."[2] It invests considerable time and expense into developing its client relationships and maintains its client list as confidential. ERG's clients control over one billion dollars in assets. Investment firms frequently approach ERG to seek access to its clients.

Wildcat is a California-based venture capital investment firm co-founded, managed, and operated by Ericson (with Wildcat, "Defendants"). In connection with Wildcat, Ericson has created and operated numerous Delaware entities. Wildcat charges its investors (1) a 2.5% management fee on all capital invested in Wildcat's funds and (2) a 20% "carry" fee on all gains made by the investments in its funds.

In July 2018, Wildcat reached out to and then met with ERG. At the meeting, Wildcat explained that it "was raising a fund, and Wildcat would like ERG to help

---

[1] C.A. No. 2019-0627-KSJM, Docket ("Dkt.") 52, Verified Suppl. Compl. ("Suppl. Compl.").

[2] *Id.* ¶¶ 1, 19, 65.

2

bring investors into the fund."[3] Wildcat and ERG reached an agreement "that if a certain amount of assets were raised, Wildcat would share its fees with ERG."[4]

During an August 10, 2018 phone call with Ericson, an ERG representative again explained "that if ERG and Wildcat were to work together, ERG would receive a portion of the fees Wildcat generated from investments arising out of ERG's relationships with and recommendations to its investor clients."[5] ERG alleges that Ericson agreed to this compensation arrangement on behalf of Wildcat.

On August 13, 2018, ERG and Wildcat signed the NDA. The purpose of the NDA was to ensure that ERG could confidentially share its client lists, contacts, and relationships with Wildcat and to ensure that Wildcat would not use this information for any purpose other than (1) evaluating the "potential business relationship" between Wildcat and ERG, or (2) "as a client of ERG," should Wildcat agree to be ERG's client.[6] Section 1 of the NDA, entitled "Purpose," states:

> The parties wish to explore and evaluate a potential business relationship of mutual interest in relation to endowment-style investing for family offices (the "Opportunity"), and in connection with the Opportunity, each party has disclosed and may further disclose to the other party confidential and business information and

---

[3] *Id.* ¶ 17.

[4] *Id.*

[5] *Id.* ¶ 18.

[6] Suppl. Compl. Ex. A ("NDA") §§ 1, 3.

trade secrets that both parties desire to treat as confidential.[7]

To accomplish this purpose, Section 3 of the NDA prohibited Wildcat from disclosing or using ERG's confidential client lists, contacts, or relationships "for any purpose except to evaluate and engage in discussions concerning the Opportunity."[8] Section 1 defined "Opportunity" as "a potential business relationship of mutual interest in relation to endowment-style investing for family offices" between Wildcat and ERG.[9] Section 3 also restricted Wildcat from disclosing or using ERG's confidential information by stating: "For the avoidance of doubt, Wildcat shall not use any Confidential Information of ERG, including but not limited to the identity of . . . Clients, for any purpose whatsoever, except to evaluate the Opportunity or as a client of ERG."[10]

---

[7] *Id.* § 1.

[8] *Id.* § 3.

[9] *Id.* § 1.

[10] *Id.* § 3.

Wildcat and ERG agreed in Section 9 of the NDA that

> breach or threatened breach of this Agreement will cause irreparable injury to the other party and that money damages will not provide an adequate remedy for such breach or threatened breach, and both parties hereby agree that, in the event of such a breach or threatened breach, the non-breaching party will also be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.[11]

After securing Wildcat's oral agreement regarding the compensation arrangement and obtaining the executed NDA, ERG went to work introducing its clients to Wildcat. Over a twelve-month period, Wildcat asked ERG for its assistance in making introductions, and ERG recommended and introduced Wildcat to at least twenty-five of ERG's investor clients, including: at least fifteen investors controlling over $1 billion each; five investors controlling over $10 billion each; and two investors controlling over $100 billion each. On multiple occasions, Ericson expressed his appreciation of the service that ERG was providing.

In June 2019, Ericson emailed ERG: "At some point we should talk about your business model and how to best make sure we are including you appropriately without causing undue friction for you, us or the clients."[12]

---

[11] *Id.* § 9.

[12] Suppl. Compl. ¶ 42.

**B.     Wildcat Ceases Communications with ERG.**

In July 2019, Wildcat cut off communication with ERG.  Uncertain about this development, ERG called to request updates on how Wildcat's interactions with ERG's clients were progressing.  Ericson responded by stating that "(1) Wildcat never agreed to work with ERG, (2) Wildcat never agreed to split fees on investors that were originated by ERG, and (3) ERG never provided any serious value in helping Wildcat find investors and grow its business."[13]  Ericson denied entering into a compensation agreement.  Ericson also denied that the NDA was enforceable and informed ERG that Wildcat intended to continue seeking and accepting investments from ERG's investor clients.

In November 2019, after ERG initiated this litigation, Wildcat used connections that it made through ERG to hire a new partner—Ahmed Khaled Jawa, an affiliate of Starling Group, a Dubai-based family office.  ERG had recommended Wildcat to Starling group in April 2019.  Today, Jawa is one of five partners at Wildcat.

According to ERG, Wildcat "has met with approximately half a dozen ERG clients, which ERG introduced to Wildcat, to solicit investments" since ERG initiated this litigation.[14]  Wildcat has used and is continuing to use ERG's

---

[13] *Id.* ¶ 46.

[14] *Id.* ¶ 54.

confidential information to seek and accept investments from ERG's investor clients, which places ERG's relationships with them at material risk. Wildcat refuses to stop seeking investments from these clients and refuses to even communicate with ERG about Wildcat's interactions with ERG's clients.

## C. ERG Sues Wildcat.

ERG brought this action in August 2019, seeking a preliminary injunction and damages. In December 2020, with leave of the court, Plaintiff supplemented the complaint. The Supplemented Complaint contains five counts:

- Count I asserts a claim for specific performance against Wildcat for breach of the NDA, seeking preliminary and permanent injunctions "(1) forbidding Wildcat from seeking investments from, accepting investments from, or contacting any of ERG's investor clients whose information ERG disclosed to Wildcat and (2) forbidding Wildcat from using ERG's investor client information for any purpose 'except to evaluate the [business relationship with ERG] or as a client of ERG'";[15]

- Count II asserts a claim against Wildcat for breach of the oral compensation agreement, seeking damages;[16]

- Count III asserts a claim against Wildcat for unjust enrichment, seeking that Wildcat "make immediate restitution" in the amount of "the full profits it received as a result of its illicit conduct";[17]

- Count IV asserts a claim against Wildcat for quantum meruit, seeking "the reasonable value of the (1) unpaid services and (2) confidential client information";[18]

---

[15] Suppl. Compl. ¶¶ 67, 55–67 (alteration in original).

[16] *Id.* ¶¶ 68–75.

[17] *Id.* ¶¶ 79, 76–79.

[18] *Id.* ¶¶ 85, 80–85.

7

- Count V asserts a claim against Wildcat and Ericson for common law fraud, seeking damages.[19]

Defendants moved to dismiss the complaint, and the motion was fully briefed.[20] The court held oral argument on Defendants' motion to dismiss in December 2020.[21]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss all counts under Rule 12(b)(6) for failure to state a claim, all counts under Rule 12(b)(1) for lack of subject matter jurisdiction, and the count asserted against Ericson under Rule 12(b)(2) for lack of personal jurisdiction. This decision first addresses Ericson's Rule 12(b)(2) motion before evaluating the arguments under Rules 12(b)(1) and 12(b)(6) as to Wildcat.

### A. Personal Jurisdiction as to Ericson

"When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[22] In ruling on a 12(b)(2) motion,

---

[19] *Id.* ¶¶ 86–92.

[20] Defendants moved to dismiss the complaint before Plaintiff supplemented the complaint, and the parties rested on the prior briefing after the Supplemented Complaint was filed. *See* Dkt. 44, Defs.' Opening Br. in Supp. of Mot. to Dismiss ("Defs.' Opening Br."); Dkt. 26, Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br."); Dkt. 38, Defs.' Reply Br. in Supp. of Mot. to Dismiss ("Defs.' Reply Br.").

[21] *See* Dkt. 58, Transcript, December 18, 2020, Oral Arg. on Defs.' Mot. to Dismiss, Held via Zoom.

[22] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Mill Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

this court may "consider the pleadings, affidavits, and any discovery of record."[23] "If, as here, no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'"[24]

Generally, Delaware courts resolve questions of jurisdiction using a two-step analysis, first determining "that service of process is authorized by statute,"[25] and next determining that the defendant had certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[26]

To establish jurisdiction over Ericson, Plaintiff relies on 10 *Del. C.* § 3104(c)(1) and 6 *Del. C.* § 18-109.[27] Plaintiff argues that Ericson has sufficient minimum contacts with Delaware because: Ericson created two entities, after ERG began introducing Wildcat to its clients, for the purpose of accepting the benefits of

---

[23] *Id.* (citing *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[24] *Id.* (first citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996); and then quoting *Cornerstone*, 2003 WL 1787959, at *3).

[25] *Id.*

[26] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

[27] Pl.'s Answering Br. at 44–48.

ERG's efforts; Ericson negotiated the NDA and oral agreement through Wildcat; and the NDA calls for Delaware law to govern disputes arising out of it.[28]

### 1.    Jurisdiction Under 10 *Del. C.* § 3104(c)(1)

Plaintiff argues that the court has jurisdiction over Ericson under 10 *Del. C.* § 3104(c)(1) because Ericson created and operated three Delaware entities to facilitate the transactions out of which this dispute arises and Wildcat signed an NDA that is governed by Delaware law.[29]

Section 3104(c)(1) confers jurisdiction on this court over nonresidents "who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State."[30]  "[O]wnership of a Delaware subsidiary does not, without more, amount to the transaction of business under Delaware's Long Arm Statute."[31]    Ownership of a Delaware subsidiary can, however, fall within Section 3104(c)(1) if "the underlying cause of action arises from the creation and operation of the Delaware subsidiary."[32]

---

[28] *Id.* at 49–50.

[29] *Id.* at 44.

[30] 10 *Del. C.* § 3104(c)(1).

[31] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 439 (Del. 2005).

[32] *Id.* at 439–40 ("This is the case where the foreign corporation created and operated the Delaware subsidiary in a manner that would avail itself of the benefits and protections of the laws of the State of Delaware."); *see also Papendick v. Bosch*, 410 A.2d 148, 152–53 (Del. 1979) (holding that this court had jurisdiction where the defendant "came into the State of Delaware to create . . . a subsidiary corporation for the purpose of implementing [the] contract [at issue]"); *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2017 WL 3912632,

Plaintiff relies on *AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc.*, where a foreign bank created a Delaware subsidiary "for the express purpose of facilitating an investment by [the defendant] in [the acquisition target]."[33] The parties there had stipulated that the agreement at issue shall be governed by Delaware law.[34] Focusing on those two facts, the court held that "the totality of the circumstances show that [the foreign bank] engaged in sufficient conduct to constitute transacting business in this State within the meaning of Delaware's Long Arm Statute."[35]

The facts before the court are disintuighable from those in *AeroGlobal*. The Delaware subsidiaries here were not created for the "express" purpose of carrying out a particular transaction, and Ericson was not a party to the NDA containing a Delaware choice of law provision (Wildcat was). Further, the one claim asserted against Ericson arises out of the alleged oral agreement—not the NDA.

The totality of the circumstances show that Ericson has not engaged in sufficient conduct to constitute transacting business in this State within the meaning of Delaware's Long Arm Statute.

---

at *5 (Del. Ch. Sept. 7, 2017) ("To confer jurisdiction, the transaction of business must have a tight nexus to the cause of action and must form a *source of the claim*." (internal quotation marks omitted)).

[33] *AeroGlobal*, 871 A.2d at 438.

[34] *Id.*

[35] *See id.* at 440.

11

## 2.    Jurisdiction Under 6 *Del. C.* § 18-109

Plaintiff argues that the court also has jurisdiction over Ericson under 6 *Del. C.* § 18-109 because "Ericson is Wildcat's manager, and this dispute arises out of Mr. Ericson's actions in negotiating the NDA and oral compensation agreement on behalf of Wildcat, a Delaware LLC."[36]

Under Section 18-109, this court has jurisdiction over the manager of an LLC "in all . . . proceedings brought in the State of Delaware involving or relating to the business of the limited liability company."[37]  An action "involves or relates" to the business of an LLC if:

> (1) the allegations against [the manager] focus centrally on his rights, duties and obligations as a manager of a Delaware LLC; (2) the resolution of this matter is inextricably bound up in Delaware law; and (3) Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.[38]

This court has interpreted that provision to narrowly refer to corporate governance and the internal affairs of an LLC.[39]

---

[36] Pl.'s Answering Br. at 48.

[37] 6 *Del. C.* § 18-109(a).

[38] *Vichi v. Koninklijke Phillips Elecs. N.V.*, 2009 WL 4345724, at *8 (Del. Ch. Dec. 1, 2009) (alterations in original) (quoting *Assist Stock Mgmt. LLC v. Rosheim*, 753 A.2d 974, 981 (Del. Ch. 2000)).

[39] *See CLP Toxicology*, 2020 WL 3564622, at *12 (indicating that "tort or contract claims unconnected to the internal affairs or corporate governance" of an LLC do not fall within the scope of Section 18-109); *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *9

Plaintiff overstates the breadth of this court's holding in *CLP Toxicology*, arguing that it stands for the proposition that Section 18-109 applies "when the claims alleged involve members' actions in their official capacity negotiating contracts on behalf of Delaware LLCs."[40] The *CLP Toxicology* court instead held that Section 18-109 refers "to the internal affairs or corporate governance issues that Delaware law is concerned with" and not to "tort or contract claims."[41] Because the only claim brought against Ericson is for fraud in connection with an oral agreement with a third party, it is not a corporate governance or internal affairs claim that would ordinarily fall within the scope of Section 18-109. For that reason, Section 18-109 does not supply personal jurisdiction over Ericson.[42]

### 3. Jurisdictional Discovery Is Not Warranted.

Plaintiff contends that, even if the court declines to rule that it has jurisdiction over Ericson on the current record, it should deny the motion to dismiss without prejudice and allow ERG to take jurisdictional discovery.[43]

---

(Del. Ch. June 15, 2011) (holding that the court did not have personal jurisdiction because the claims did not "involve or relate to [the LLC's] business in the sense of its internal business as required by the statute"), *aff'd*, 38 A.3d 1254 (Del. 2012).

[40] *See* Pl.'s Answering Br. at 48 (citing *CLP Toxicology*, 2020 WL 3564622, at *12).

[41] 2020 WL 3564622, at *12.

[42] Because the court finds that it does not have jurisdiction over Ericson under Section 3104(c)(1) or Section 18-109, it need not undertake the minimum contacts analysis.

[43] Pl.'s Answering Br. at 43–44.

This court may decide a motion to dismiss under Rule 12(b)(2) on the pleadings and affidavits.[44] If the motion is decided on the pleadings and affidavits, the plaintiff must "make a *prima facie* showing of personal jurisdiction."[45] "Only where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction."[46] That is to say, a plaintiff "cannot use jurisdictional discovery to simply 'fish for a possible basis for this court's jurisdiction.'"[47]

Plaintiff argues that "although Defendants have brought factual jurisdictional arguments in their motion, ERG has been effectively denied its right to obtain reasonable discovery prior to being required to mount proof against the same."[48] But Plaintiff "does not explain how discovery would provide the 'something more'

---

[44] *Extell DV LLC v. Hemeyer*, 2020 WL 1950503, at *4 (Del. Ch. Apr. 23, 2020); *Ryan*, 935 A.2d at 265; *accord. Hart Hldg. Co. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 539 (Del. Ch. 1991).

[45] *Hart*, 593 A.2d at 539; *accord. Fitzgerald v. Cantor*, 1998 WL 842316, at *2 (Del. Ch. Nov. 10, 1998).

[46] *Hart*, 593 A.2d at 539.

[47] *CLP Toxicology*, 2020 WL 3564622, at *15 (quoting *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 816 n.195 (Del. Ch. 2009)).

[48] Pl.'s Answering Br. at 43.

14

needed to establish personal jurisdiction."[49]   Nor does Plaintiff suggest that jurisdictional discovery would amount to anything more than a fishing expedition.

Plaintiff has not made a *prima facie* showing for this court's personal jurisdiction over Ericson and therefore jurisdictional discovery is unwarranted. Count V as asserted against Ericson is dismissed.

## B.    Subject Matter Jurisdiction

"As Delaware's Constitutional court of equity, the Court of Chancery can acquire subject matter jurisdiction over a cause in only three ways, namely, if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[50]

This case does not implicate the first or third bases for this court's subject matter jurisdiction. Plaintiff's request for specific performance of the NDA is the only potential basis for this court's equitable jurisdiction. Wildcat argues that Plaintiff's request for specific performance of the NDA is insufficient to confer subject matter jurisdiction because Plaintiff has an adequate remedy at law.[51]

---

[49] *See CLP Toxicology*, 2020 WL 3564622, at *15.

[50] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (citing 10 *Del. C.* §§ 341–42).

[51] Defs.' Opening Br. at 13–18.

"Although specific performance is an equitable remedy upon which equity jurisdiction might be predicated, that is true only if the complaint, objectively viewed, discloses a genuine need for such equitable relief."[52] In order to prevent plaintiffs from praying "for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery" where a complete remedy otherwise exists,[53] the court "must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain."[54] The analysis requires a "realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate."[55] An adequate remedy at law is one that will "afford the plaintiff full, fair, and complete relief."[56] "The party seeking an equitable remedy has the burden to show that a legal remedy would be inadequate."[57]

---

[52] *Candlewood*, 859 A.2d at 997.

[53] *Pitts v. City of Wilm.*, 2009 WL 1204492, at *5 (Del. Ch. Apr. 27, 2009) (quoting *Christiana Town Ctr. LLC v. New Castle Cnty.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003)).

[54] *Candlewood*, 859 A.2d at 997 (citing *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586 (Del. 1970); *Hughes Tool Co. v. Fawcett Publ'ns Inc.*, 297 A.2d 428 (Del. Ch. 1972), *rev'd on other grounds*, 315 A.2d 577 (Del. 1974)).

[55] *Id.* (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987)).

[56] *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995) (quoting *Hughes*, 315 A.2d at 579).

[57] *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2004 WL 1192602, at *2 (Del. Ch. May 28, 2004).

Breach of confidentiality and non-disclosure obligations lend themselves to equitable remedies, and this court has routinely exercised subject matter jurisdiction over such disputes.[58] This case is no different. To meet its burden, ERG alleges that "ERG's relationships with its high net worth clients are unique and invaluable."[59] ERG's business revolves around introducing managers to its exclusive clients; ERG has invested considerable time, effort and expense, into developing these client relationships, as the NDA confirms, and ERG takes concerted efforts to maintain the secrecy of this information.[60] ERG further alleges that by breaching the NDA, Wildcat "is putting at material risk ERG's client relationships by refusing even to communicate with ERG about Wildcat's interactions with those ERG clients."[61]

---

[58] *See, e.g.*, *360 Campaign Consulting, LLC v. Diversity Comm'n, LLC*, 2020 WL 1320909, at *2–6 (Del. Ch. Mar. 20, 2020); *AlixPartners, LLP v. Mori*, 2019 WL 6327325, at *5–9 (Del. Ch. Nov. 26, 2019); *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *1, *8–9 (Del. Ch. May 30, 2019).

[59] Suppl. Compl. ¶ 65; *see id.* ¶¶ 1, 3.

[60] *See Arkema Inc. v. Dow Chem. Co.*, 2010 WL 2334386, at *5 (Del. Ch. May 25, 2010) (holding that damage to reputation among customers constituted irreparable harm). Wildcat suggests that Plaintiff failed to provide "specific evidence that it would lose customers," Defs.' Reply Br. at 4, but the *Arkema* court did not hold that specific evidence is required to show irreparable harm. *See* 2010 WL 2334386, at *4–5. The court did, however, emphasize that "it would be very difficult, if not impossible, to quantify the extent of the likely harm to [the plaintiff's] goodwill and reputation." *Id.* at *5. As in *Arkema*, it would be very difficult to quantify the extent of the harm to ERG's goodwill and reputation if Wildcat were to continue utilizing ERG's confidential client information purportedly protected by the NDA.

[61] Suppl. Compl. ¶ 3.

17

These factors support an inference that equitable relief might be required to remedy ERG's claims of breach.[62]

Two additional factors bolster this conclusion. First, ERG alleges that it will be irreparably harmed absent the grant of specific performance because "determining damages caused by Wildcat's past and future breaches of the NDA would be difficult to calculate," and this allegation is reasonably conceivable.[63] "[I]rreparable harm warranting injunctive relief is appropriate in cases where damages would be difficult to assess," and the inherent difficulty of assessing damages for breaching the NDA shows irreparable harm exists here.[64] The value of the confidential information would be difficult to quantify, and Plaintiff alleges that the breach will continue indefinitely absent injunctive relief.[65]

---

[62] Wildcat relies on *Diebold* to support the argument that "[h]ere, there is no 'collision course'—ERG alleges that the breach has already occurred—and ERG fails entirely to explain how it has been or will be harmed by that breach." *See* Defs.' Opening Br. at 16–17 (citing 267 A.2d at 590). Wildcat misapplies *Diebold* to the present case because the "collision course" rationale there applied to a situation in which a breach of the contract had not yet occurred. *See* 267 A.2d at 588–90. Here, ERG alleges that the breach has already occurred *and is ongoing*. As discussed above, Plaintiff has pled facts that suggest it has been and will continue to be harmed.

[63] Suppl. Compl. ¶ 66.

[64] *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1341 (Del. Ch. 1987); *see also Mountain W. Series of Lockton Cos. v. Alliant Ins. Servs.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019) (identifying scenarios involving irreparable harm).

[65] Wildcat cites to *Alliance Compressors LLC v. Lennox Industries, Inc.* and *Athene Life and Annuity Co. v. American General Life Insurance Co.* as support, but those cases are unpersuasive in the given context. *See* Defs.' Opening Br. at 17–18 (citing 2020 WL 57897, at *1–3, 5 (Del. Ch. Jan. 6, 2020); 2019 WL 3451376, at *8 (Del. Ch. July 31, 2019)). In both of those cases, unlike here, the court found that money damages sufficed

18

Second, Wildcat and ERG stipulated in the NDA that "[e]ach party understands and agrees that its breach or threatened breach of this Agreement will cause *irreparable injury* to the other party and that *money damages will not provide an adequate remedy* for such breach or threatened breach."[66] The NDA further provides that "in the event of such a breach or threatened breach, the non-breaching party will . . . be entitled . . . to equitable relief, including injunctive relief and specific performance."[67] Although it is true that parties cannot confer subject matter jurisdiction through contractual stipulation,[68] Delaware courts give some presumptive weight to contractual stipulations of irreparable harm and typically require that a party seeking to avoid the force of the stipulation demonstrate that "the facts plainly do not warrant" such a finding.[69] Wildcat provides no compelling reason to cast aside the parties' bargain in this case.

---

and were readily calculable. *See Alliance Compressors*, 2020 WL 578997, at *5; *Athene*, 2019 WL 3451376, at *9.

[66] NDA ¶ 9 (emphasis added); *see also id.* ¶ 3 ("Each party further acknowledges and agrees that the disclosure of Confidential Information of the other party may cause substantial and irreparable competitive harm . . . .").

[67] *Id.* ¶ 9.

[68] *See* Defs.' Opening Br. at 18–19 (citing *Quarum v. Mitchell Int'l, Inc.*, 2019 WL 158153, at *4 (Del. Ch. Jan. 10, 2019)).

[69] *See Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *23–24 (Del. Ch. Aug. 4, 2006); *see also Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012) ("Our courts have long held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing . . . injunctive relief." (internal quotation marks omitted) (ellipses in original)); *Quarum*, 2019 WL 158153, at *3 ("Although a contractual stipulation as to the irreparable nature of

Accordingly, Plaintiff's request for specific performance of the NDA gives rise to this court's subject matter jurisdiction. The clean-up doctrine supplies jurisdiction as to the remaining claims.[70] Wildcat's motion to dismiss pursuant to Rule 12(b)(1) is therefore denied.

## C. Failure to State a Claim

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[71] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[72] The court, however, need

---

the harm that would result from a breach cannot limit this Court's discretion to decline to order injunctive relief, such a stipulation does allow the Court to make a finding of irreparable harm provided the agreement containing the stipulation is otherwise enforceable."); *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) ("Delaware courts do not lightly trump the freedom to contract and, in the absence of some countervailing public policy interest, courts should respect the parties' bargain.").

[70] *See Darby Emerging Mkts. Fund, L.P. v. Ryan*, 2013 WL 6401131, at *8 (Del. Ch. Nov. 27, 2013) ("The existence of jurisdiction in this Court over even a single count . . . is sufficient for the exercise of jurisdiction over the remaining counts under the cleanup doctrine." (ellipses in original) (quoting *Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *7 (Del. Ch. Dec. 7, 2012))).

[71] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[72] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[73]

Wildcat seeks to dismiss each Count for failure to state a claim, arguing that: the complaint fails to allege a breach of the NDA; the complaint fails to allege a breach of the alleged oral agreement or a basis for the alleged damages, and the alleged oral agreement is unenforceable; the unjust enrichment and quantum meruit claims are barred by express contracts and by principals of restitution; and the fraud claim fails to allege scienter for promissory fraud or reasonable reliance.[74]

### 1. Breach of the NDA

Plaintiff contends that Wildcat breached Section 3 and Section 4 of the NDA by using Plaintiff's confidential information to seek *and accept* investments from investors without keeping Plaintiff apprised of the discussions.[75] Wildcat counters that the Supplemented Complaint alleges only that Wildcat solicited ERG investors without keeping ERG apprised of these discussions, and that such actions do not constitute breach of the NDA.[76]

---

[73] *Price v. E.I. du Pont de Nemours Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[74] Defs.' Opening Br. at 22–44.

[75] Pl.'s Answering Br. at 14–18.

[76] Defs.' Reply Br. at 9–12.

"When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence."[77] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[78] Further, the "general terms of the contract must yield to more specific terms."[79]

Wildcat relies on Section 3 of the NDA, under which "each party agree[d] not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions concerning the Opportunity."[80] It contends that the exception permitted Wildcat to "evaluate the Opportunity" by engaging in direct discussions with prospective investors.[81]

Wildcat's argument oversimplifies Plaintiff's allegations. The Supplemented Complaint alleges that Wildcat used ERG's confidential information to cut ERG out of the process.[82] Such alleged conduct is inconsistent with the purpose of the NDA,

---

[77] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (internal quotation marks omitted).

[78] *E.g.*, *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[79] *Sunline Com. Carriers*, 206 A.3d at 846.

[80] NDA § 3.

[81] Defs.' Opening Br. at 25–26.

[82] *See* Suppl. Compl. ¶ 45 ("[A]fter receiving the benefits of ERG's protected confidential information about, and relationships with, ERG's world-class investor clients and ERG's services, Wildcat began cutting off meaningful communications with ERG."); *id.* ¶ 49 ("Ericson stated Wildcat intended to continue seeking and accepting investments from

22

which was "to explore and evaluate a potential business relationship *of mutual interest* in relation to endowment-style investing for family offices," between ERG and Wildcat.[83] Such conduct is also inconsistent with the NDA's definition of "Opportunity," which was something "of *mutual interest*" to ERG and Wildcat.[84] The Supplemented Complaint therefore adequately states a claim for breach of the NDA.

Because Plaintiff adequately alleges that Wildcat breached Section 3 of the NDA, Plaintiff has also stated a claim for breach of Section 4, which provides that "[e]ach party shall promptly notify the other party if it becomes aware of any unauthorized use or disclosure of the Confidential Information in violation hereof."[85] Wildcat does not dispute that it failed to inform ERG of various communications

---

ERG's investor clients . . . in violation of the explicit terms of the NDA."); *id.* ¶ 50 ("Wildcat refused to discuss in good faith, let alone honor, its promises to compensate ERG and refused otherwise to compensate ERG on a commercially reasonable basis for ERG's invaluable client information, client contacts and services."); *id.* ¶¶ 52–53 ("In November 2019, after ERG initiated this litigation, Wildcat took advantage of connections that it made through ERG to hire a new partner . . . . Wildcat therefore has used ERG's protected client and other proprietary information in violation of the NDA and without providing ERG with any commercially reasonable compensation."); *id.* ¶ 54 ("[S]ince ERG initiated this litigation, Wildcat has met with approximately half a dozen ERG clients, which ERG introduced to Wildcat, to solicit investments. . . . Because Wildcat has gone dark, however, ERG has been unable to determine with certainty whether Wildcat has transacted with these clients of ERG.").

[83] *See* NDA § 1 (emphasis added).

[84] *See id.*; *see also* Suppl. Compl. ¶ 15 ("Krasnoff made it clear he was seeking to begin a *mutually beneficial* business relationship. . . ." (emphasis added)).

[85] NDA § 4.

with prospective clients.  Because Plaintiff has pled facts from which the court can infer that Wildcat was in "violation" of the NDA, it follows that Plaintiff has pled facts from which the court can infer that Wildcat failed to notify ERG of this use or disclosure.

Wildcat's motion to dismiss Count I is denied.

### 2. Breach of the Oral Compensation Agreement

Wildcat argues that Count II must be dismissed because the alleged oral agreement is unenforceable.[86]  Wildcat also argues that the complaint fails to state a claim for breach of the alleged oral agreement because the complaint fails to allege an actual breach of the alleged agreement or resulting damages.[87]

### a. The Alleged Oral Agreement Is Enforceable.

Wildcat argues that the alleged oral agreement is unenforceable because it lacks definiteness, violates the statute of frauds, and is illegal.  None of these arguments prevail at the pleading stage.

Wildcat first argues that the alleged oral agreement is indefinite because it "says nothing about what particular fees, or what 'portion' of those fees Wildcat purportedly agreed to pay ERG."[88]  Under Delaware law, contractual terms must be

---

[86] Defs.' Opening Br. at 28–37.

[87] *Id.* at 26–28.

[88] *Id.* at 28.

"sufficiently definite" for "a valid contract" to exist,[89] but contractual terms are sufficiently definite if they "provide a basis for determining the existence of a breach and for giving an appropriate remedy."[90] At the pleading stage, a plaintiff need only plead facts from which a court can infer the existence of definite terms.[91]

Plaintiff adequately pleads facts from which the court can infer a definite contract. The Supplemented Complaint alleges that, during an August 10, 2018 telephone call, "the parties discussed ERG's compensation model," and "Mr. Ericson and Mr. Krasnoff understood, that if ERG and Wildcat were to work together, ERG would receive a portion of the fees Wildcat generated from investments arising out of ERG's relationships with and recommendations to its

---

[89] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212–13 (Del. 2018) (quoting *Osborn*, 991 A.2d at 1158).

[90] *Id.* at 1232 ("A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."); *see also Iacono v. Estate of Capano*, 2020 WL 3495328, at *9 (Del. Ch. June 29, 2020) ("A contract must contain all material terms to be enforceable. 'What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential.'" (citation omitted) (quoting *Eagle Force*, 187 A.3d at 1230)); *Jackson v. Nocks*, 2018 WL 1935961, at *6 (Del. Ch. Apr. 24, 2018) ("In a claim for specific performance, all essential terms of the agreement must be sufficiently definite to establish an enforceable contract." (internal quotation marks omitted)).

[91] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) ("[A] plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" (quoting Ct. Ch. R. 8(a)(1))).

investor clients."[92]  Although Plaintiff does not allege the specific amount of the fees or the intervals at which they will be paid, the court can infer the existence of such an agreement from these allegations.  These allegations constitute fair notice of the alleged oral agreement by pleading facts that suggest the parties agreed on a fee structure.[93]

Wildcat next argues that that the alleged oral agreement is invalid under the statute of frauds because it cannot be performed in under one year.[94]  "It has been the law in Delaware for many years that the Statute of Frauds does not apply to a contract which may, by any possibility, be performed within a year."[95]  "That is, if

---

[92] Suppl. Compl. ¶ 18.

[93] *See VLIW Tech.*, 840 A.2d at 611 ("Such a statement must only give the defendant fair notice of a claim and is to be liberally construed."); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (requiring "specific supporting factual allegations" to overcome a motion to dismiss and permitting the court to accept as true "reasonable inferences that logically flow from the face of the complaint").  Wildcat contends that "[t]he agreement says nothing about what particular fees, or what 'portion' of those fees Wildcat purportedly agreed to pay ERG." Defs.' Opening Br. at 29.  Wildcat cites *Litle v. Waters* to support its argument, but that case is inapposite.  *See* Defs.' Reply Br. at 15–16 (citing 1992 WL 25758, at *5–6 (Del. Ch. Feb. 11, 1992)).  There, the court held that "the agreement has no provisions as to how much will be paid, how it will be paid, when it will be paid and to whom it will be paid." *Litle*, 1992 WL 25758, at *6.  Plaintiff, however, has pled facts suggesting that the parties communicated via telephone and agreed upon a compensation model for the agreement.  Based on the well-pled facts, a reasonable person could infer that the alleged oral agreement contained provisions detailing the fee structure.

[94] Defs.' Opening Br. at 30–32.

[95] *Haveg Corp. v. Guyer*, 211 A. 2d 910, 912 (Del. 1965).

26

a contract *may be* performed within a year, the statute does not apply."[96] The Supplemented Complaint acknowledges that "the lifecycle of a venture capital fund *may* be ten years or more,"[97] but it is *possible* that the duration of this particular Wildcat fund could have been less than one year. Plaintiff has therefore pled facts indicating that the alleged oral agreement is not subject to the statute of frauds.

Wildcat also argues that the alleged fee demands made by ERG violate federal securities law because ERG acted as a "broker" despite not being a registered broker-dealer.[98] Illegal contracts are unenforceable under Delaware law,[99] and it is unlawful under Section 15(a) of the Exchange Act "for any broker or dealer . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered" as such with the SEC.[100] Plaintiff does not dispute that ERG is not a registered broker-dealer. Instead, Plaintiff argues that

---

[96] *Brandner v. Del. State Hous. Auth.*, 605 A.2d 1, 1 (Del. Ch. 1991).

[97] Suppl. Compl. ¶ 66 (emphasis added).

[98] Defs.' Opening Br. at 32–37.

[99] *See, e.g.*, *Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965); *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *80 (Del. Ch. Nov. 30, 2020); *Bunting v. Citizens Fin. Gp., Inc.*, 2007 WL 2122137, at *5 (Del. Super. June 29, 2007). Federal securities law is in accord. *See* 15 U.S.C. § 78cc(b) ("Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void . . . .").

[100] 15 U.S.C. § 78o(a)(1); *see also id.* § 78o(b) (outlining the way in which a broker or dealer may register).

ERG did not act as a "broker" as that term is defined in the Exchange Act and construed by federal precedent.[101]

The Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."[102] "'Merely bringing together the parties to transactions, even those involving the purchase and sale of securities, is not enough' to warrant broker registration under Section 15(a)."[103] Under the "finder's exception," finders are allowed to "perform a narrow scope of activities without triggering the b[r]oker/dealer registration requirements."[104] "The distinction drawn between the broker and the finder or middleman is that the latter bring[s] the parties together with no involvement on [his] part in negotiating the price or any of the other terms of the transaction."[105] Finders

---

[101] *See* Pl.'s Answering Br. at 28–31.

[102] 15 U.S.C. § 78c(a)(4)(A); *see also SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (holding that a person is a broker if their conduct is "characterized by a certain regularity of participation in securities transactions at key points in the chain of distribution" (internal quotation marks omitted)).

[103] *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1329–41 (M.D. Fla. 2011) (quoting *Apex Glob. P'rs, Inc. v. Kaye/Bassman Int'l Corp.*, 2009 WL 2777869, at *3 (N.D. Tex. Aug. 31, 2009)); *accord. Maiden Lane P'rs, LLC v. Perseus Realty P'rs, G.P. II, LLC*, 2011 WL 2342734, at *4 (Mass. Super. Ct. May 27, 2011).

[104] *Kramer*, 778 F. Supp. 2d at 1336 (alteration in original).

[105] *Maiden Lane*, 2011 WL 2342734, at *4 (alterations in original) (internal quotation marks omitted); *see Found. Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294, at *6 (S.D.N.Y. Aug. 11, 2010) ("[A] finder finds potential buyers or sellers, stimulates their interest, and brings parties together, while a broker brings the parties to an agreement on particular terms." (alteration in original) (quoting *Jones v. Whelan*, 2002 WL 485729, at *7 (S.D.N.Y. Mar. 29, 2002))).

may even "facilitat[e] securities transactions among other persons," as doing so does not amount to "effecting transactions in securities for the account of others."[106]

Although transaction-based compensation is one of the "hallmarks" of a broker, "this is by no means dispositive."[107] For a person to be deemed a broker as opposed to a finder, "[t]he evidence must . . . show involvement at key points in the chain of distribution, such as participating in the negotiation, analyzing the issuer's financial needs, discussing the details of the transaction, and recommending an investment."[108] Conversely, when a person is neither entrusted with investment assets for nor "authorized to transact for the account of others," these factors indicate the person is not a "broker."[109]

ERG's minimal involvement in the underlying transactions of Wildcat's fund makes it reasonably conceivable that ERG was a "finder" and not a "broker" under the Exchange Act. ERG's business involves connecting its clients with successful fund managers and advising its clients regarding how to allocate their capital between those fund managers. Once ERG's clients invest in those funds, the management of that capital is at the sole discretion of the fund manager (in this case,

---

[106] *SEC v. M & A W., Inc.*, 2005 WL 1514101, at *9 (N.D. Cal. June 20, 2005) (emphasis omitted).

[107] *Maiden Lane*, 2011 WL 2342734, at *4.

[108] *Id.* (internal quotation marks omitted).

[109] *M & A W.*, 2005 WL 1514101, at *9 (internal quotation marks omitted).

Wildcat).  It is reasonably conceivable that ERG does not "effect[] transactions in securities for the account"[110] of its clients nor "discuss[] the details of [those] transactions."[111]  It is reasonably conceivable that ERG limits its activities to "facilitating securities transactions among" its clients and Wildcat so as to be a "finder."[112]  It is therefore reasonably conceivable that the alleged oral agreement does not violate federal securities law.[113]

### b.    The Supplemented Complaint Alleges an Actual Breach of the Oral Agreement and Damages.

Wildcat contends that the Supplemented Complaint fails to allege that Wildcat has generated any fees from ERG clients and therefore fails to allege a breach of the agreement or a basis for damages.[114]

To state a claim for breach of contract, a plaintiff "must demonstrate:  first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the

---

[110] *Id.*

[111] *See Maiden Lane*, 2011 WL 2342734, at *4.

[112] *See M & A W.*, 2005 WL 1514101, at *3, *9–10 (holding that a party was not a broker); *Maiden Lane*, 2011 WL 2342734, at *1, *4–6 (declining to hold that a finder was a broker).

[113] Plaintiff also argues that, even if the court finds that ERG is a "broker" under the securities laws, Wildcat has failed to show that ERG does not fall within one of the exceptions enumerated in Section 78o(a)(1). *See* Pl.'s Answering Br. at 32–35.  Because Plaintiff has pled facts from which the court can reasonably infer that ERG was not a "broker" with respect to the alleged oral agreement, the court need not address Plaintiff's "exceptions" argument.

[114] Defs.' Opening Br. at 26–28.

plaintiff."[115] "A plaintiff must properly allege each of these elements, even where the plaintiff is seeking an equitable remedy such as specific performance."[116]

As alleged in the Supplemented Complaint, "ERG and Wildcat agreed that ERG would receive a portion of the fees Wildcat generated from investments arising out of ERG's relationships with and recommendations to its investor clients."[117] The Supplemented Complaint also details Wildcat's fee structure, from which ERG's proportional fees would be derived: "(1) a 2.5% management fee on all money invested in Wildcat's funds and (2) a 20% 'carry' fee on all gains made by the investments in its funds."[118] Plaintiff alleges that Wildcat "breached the terms of the August 10, 2018 agreement by seeking and accepting investments arising out of ERG's relationships with and recommendations to its investor clients, while refusing to pay ERG any commercially reasonable compensation for its confidential information or services."[119]

---

[115] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009) (quoting *VLIW Tech.*, 840 A.2d at 612).

[116] *Id.*

[117] Supp. Compl. ¶ 69.

[118] *Id.* ¶ 66.

[119] *Id.* ¶ 74; *see also id.* ¶ 49 ("Ericson stated Wildcat intended to continue seeking and accepting investments from ERG's investor clients, without honoring the August 10, 2018 compensation agreement."); *id.* ¶ 61 (alleging that Wildcat used "ERG's confidential information to seek and accept investments from ERG's investor clients"); *id.* ¶ 63 ("[T]here is a reasonable apprehension that Wildcat will continue to commit future wrongs as it has stated it will continue using ERG's confidential client information to seek and accept investments from ERG's clients . . . ."); *id.* ¶ 83 ("ERG . . . provided Wildcat with

Plaintiff's allegations are sufficient to support a claim that Wildcat breached the oral agreement by accepting investments without paying ERG a portion of its fees.[120] Damages could be calculated based on the amount of capital invested in Wildcat funds by these ERG clients and the contractually agreed upon portion of Wildcat's fees to which ERG would be entitled.

---

its confidential client information, which Wildcat has used to seek and accept investments from ERG's investor clients. It was the expectation that ERG would be reasonably compensated for providing Wildcat this information."). Wildcat argues that Plaintiff has failed to allege that Wildcat has "earned any fees from any ERG client," Defs.' Opening Br. at 27, but considering Wildcat employs a 2.5% management on all of its managed capital, the court can reasonably infer that Wildcat has earned fees.

[120] Plaintiff also argues that Wildcat breached the implied covenant of good faith and fair dealing by concealing its contacts with ERG's investor clients. Pl.'s Answering Br. at 19–21. Plaintiff, however, did not "give the opposing party notice of [this] claim" in its Supplemented Complaint. *See, e.g.*, *In re Gen. Motors*, 897 A.2d at 168; *Cent. Mortg.*, 27 A.3d at 535. The Supplemented Complaint does not raise the implied covenant as a distinct claim or otherwise indicate that an implied term forms the basis for its breach of contract claim. Because Plaintiff did not raise this issue until it responded to Wildcat's motion to dismiss, the court cannot consider it. *See Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *7 n.59 ("[Plaintiff] did not attempt to meet the implied covenant's intent requirement until his Opposition. His brief cannot patch pleading deficiencies."); *see also Akrout v. Jarkoy*, 2018 WL 3361401, at *3 n.23 (Del. Ch. July 10, 2018) ("Plaintiff's counsel's *post hoc* attempt to clarify the allegations in the Complaint in response to a motion to dismiss, while understandable given the paucity of the Complaint, cannot be received as a supplement or amendment to the pleading itself."); *Orman v. Cullman*, 794 A.2d 5, 28 n.59 (Del. Ch. 2002) ("[Plaintiff] improperly attempts to expand the scope of his complaint in his brief opposing the motion to dismiss . . . . At this stage of litigation, the Court is only permitted to consider the well-pleaded facts contained in the complaint and any documents incorporated by reference into that complaint . . . . Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will not be considered.").

Because the alleged oral agreement is enforceable and the Supplemented Complaint alleges an actual breach and damages, Wildcat's motion to dismiss Count II is denied.

### 3.   Unjust Enrichment and Quantum Meruit

Wildcat argues that Plaintiff's unjust enrichment and quantum meruit claims fail because the Supplemented Complaint alleges that express contracts govern the relationships between the parties.[121]

"The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[122] Similarly, a claim for quantum meruit permits "a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[123] Where an express contract controls, this court will generally dismiss claims for unjust enrichment and quantum meruit.[124]

---

[121] Defs.' Opening Br. at 37–38. Wildcat argues in the alternative that the unjust enrichment and quantum meruit claims would fail because (1) ERG has not alleged that any of its clients invested in a Wildcat fund and (2) the alleged oral contract is illegal and unenforceable under the federal securities laws. Defs.' Opening Br. at 39–40. As the court held *supra* Section II.C.1, both of those contentions are incorrect.

[122] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[123] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004).

[124] *See Kuroda*, 971 A.2d at 891 ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust

33

But where, as here, "doubt exists surrounding the existence of a contract," this court will allow the plaintiff to pursue "[these] claim[s] in the alternative . . . provided the requisite elements are adequately pleaded."[125]

Wildcat argues that Plaintiff is precluded from pleading unjust enrichment and quantum meruit because the alleged wrongdoing is expressly governed by the NDA and the oral agreement.[126] As Wildcat concedes, the NDA "makes no provision for compensation to ERG."[127] Instead, as the well-pled allegations of the Supplemented Complaint contend, that aspect of the parties' relationship was governed by an oral agreement. Those allegations are sufficiently well pled to survive a motion to dismiss, but Plaintiff has not yet proven (and may never prove) the existence of an

enrichment claim."); *Albert v. Alex Brown Mgmt. Servs, Inc.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) ("Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.").

[125] *See Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *14 (Del. Ch. Jan. 31, 2013); *see also* Ct. Ch. R. 8(e)(2) ("A party may set forth 2 or more statements of a claim . . . alternately or hypothetically . . . . When 2 or more statements are made in the alternative and 1 of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of 1 or more of the alternative statements."). Wildcat cites *Doberstein v. G–P Industries, Inc.* for the proposition that "[t]o survive a 12(b)(6) motion, a plaintiff must at a minimum identify a 'factual basis for [its] unjust enrichment claim independent of the allegations relating to [its] breach of contract claim.'" Defs.' Reply Br. at 23 (alterations in original) (quoting 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015)). But that quote is misleading. In *Doberstein*, the parties entered an express contract, which the defendants did not dispute. 2015 WL 6606484, at *1, 3. The court was not presented with a situation in which the existence of the contract was disputed, *see id.*, so *Doberstein* is inapposite.

[126] Defs.' Opening Br. at 37–38.

[127] *Id.* at 38.

oral agreement. For that reason, Plaintiff's unjust enrichment and quantum meruit claims may, at the pleading stage, proceed in the alterative to Plaintiff's claim for breach of the alleged oral agreement.

Plaintiff alleges that Wildcat was unjustly enriched by "(1) its use of ERG's confidential client information to seek and accept investments from ERG's investor clients and (2) its receipt of ERG's introduction and recommendation services for almost 12 months without providing any commercially reasonable compensation for them."[128] As a direct result, ERG alleges that it was impoverished "by means of lost exclusivity of its proprietary client information and lost time and effort spent introducing and recommending Wildcat to ERG's clients."[129] Wildcat's use of ERG's client information lacks justification, such that "[e]quity and fairness" suggest that Wildcat cannot retain the resulting benefits without properly compensating ERG.[130] Plaintiff has also pled a lack of adequate remedy at law.[131] Accordingly, Plaintiff has pled a claim for unjust enrichment.

---

[128] Suppl. Compl. ¶ 77.

[129] *Id.* ¶ 78.

[130] *See id.* ¶ 79; *see also Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999) (indicating that a party cannot "justifiably" retain the benefits resulting from a transaction if it is not "in accordance with the fundamental principles of justice or equity and good conscience" (internal quotation marks omitted)).

[131] *See* Suppl. Compl. ¶ 67 ("ERG has no adequate remedy at law . . . ."); *id.* ¶ 76 ("ERG repeats and re-alleges the allegations set forth above as if set forth herein.").

35

Plaintiff also alleges that it "provided services to Wildcat from August 2018 through July 2019" and that "ERG also provided Wildcat with its confidential client information, which Wildcat has used to seek and accept investments from ERG's investor clients."[132] In providing those services and that information, "[i]t was the expectation that ERG would be reasonably compensated."[133] It is reasonable to infer that Wildcat should have known that ERG expected to be paid, considering ERG's business consists of providing such services and information in exchange for compensation. Accordingly, Plaintiff has pled a claim for quantum meruit.

Wildcat's motion to dismiss Counts III and IV is denied.

### 4. Fraud

Wildcat argues that Plaintiff's promissory fraud claim fails because Plaintiff pleads no specific facts suggesting that Wildcat intended not to perform, and, even if Plaintiff does plead such facts, its claim would still fail because ERG "cannot have reasonably relied on an alleged oral promise to pay it illegal compensation."[134] Having already held that Plaintiff has presented facts from which the court can infer the alleged oral agreement was not illegal, the court focuses on the first of Wildcat's two arguments.

---

[132] *Id.* ¶¶ 81, 83.

[133] *Id.*

[134] Defs.' Opening Br. at 42.

"In order for a fraud claim to survive a motion to dismiss, a plaintiff needs to allege: (1) that a defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation."[135]

Pursuant to Court of Chancery Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[136] "[T]o state a claim for promissory fraud, a plaintiff must plead something more than a promise, mere nonperformance, justifiable reliance, damages, and a general averment of a culpable state of mind."[137] To assert a claim for promissory fraud, "the plaintiff also must plead specific facts that lead to

[135] *Grunstein v. Silva*, 2009 WL 4698541, at *12 (Del. Ch. Dec. 8, 2009) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)); *accord. Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[136] Ct. Ch. R. 9(b); *see also Bamford v. Penfold, L.P.*, 2020 WL 967942, at *11–13 (Del. Ch. Feb. 28, 2020) (holding that, in the non-promissory fraud context, a complaint need only "put defendants on notice of the misconduct with which they are charged and protect defendants against false charges of immoral or fraudulent behavior").

[137] *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *10 (Del. Ch. Dec. 23, 2008).

a reasonable inference that the promissor had no intention of performing at the time the promise was made."[138]

Wildcat contends that the Supplemented Complaint's allegations fall short of the heightened pleading standard for promissory fraud because it "fails to allege a single specific fact that could support *any* inference regarding . . . Wildcat's intent at the time . . . the parties allegedly entered into an oral agreement."[139]

Plaintiff counters that the Supplemented Complaint does plead specific facts, in particular pointing to the following allegations:

- Wildcat failed to perform the oral agreement;

- Wildcat "repudiated the oral compensation agreement on July 20, 2019, less than a year after making it, and less than one month after reaffirming the oral agreement via email";[140]

- Wildcat's "repudiation came immediately after Wildcat reaped major benefits from the oral agreement on a trip to the Middle East during which, in Mr. Ericson's words, Wildcat 'inundate[d]' ERG with requests for investor contacts, and as a result of ERG's introductions, Wildcat was able to 'keep[ them]selves very busy'";[141]

- Wildcat "continued to assure ERG the oral compensation agreement was in place . . . as late as June 26, 2019, [when] Mr. Ericson sent ERG an email regarding the logistics of how Wildcat would pay ERG and reaffirming the oral agreement."[142]

---

[138] *Id.*

[139] Defs.' Opening Br. at 43.

[140] *See* Pl.'s Answering Br. at 40 (citing Compl. ¶ 46–47).

[141] *See id.* (alterations in original) (quoting Compl. ¶¶ 40, 43).

[142] *See id.* (citing Compl. ¶ 42).

None of these alleged facts speak to Wildcat's intent not to perform at the time the alleged oral agreement was made.[143] If anything, they suggest that Wildcat intended to perform at the time the alleged oral contract was made but subsequently changed course. For example, Plaintiff acknowledges that Wildcat "continued to assure ERG the oral compensation agreement was in place" nearly one year after the alleged oral contract was made.[144] Plaintiff must "plead something more than a promise, mere nonperformance, justifiable reliance, damages, and a general averment of a culpable state of mind,"[145] but Plaintiff has failed to do so.

Wildcat's motion to dismiss Count V is granted.

## III.    CONCLUSION

Ericson's motion to dismiss for lack of personal jurisdiction is GRANTED. Wildcat's motion to dismiss is GRANTED as to Count V and is otherwise DENIED.

---

[143] The only alleged facts regarding Wildcat's intent at the time of the alleged oral agreement are found in Paragraph 18 of the Supplemented Complaint, and they are insufficient to meet the pleading standard.

[144] Pl.'s Answering Br. at 40.

[145] *See Winner Acceptance*, 2008 WL 5352063, at *10.